HARTFORD FIRE INS. CO. OF CITY OF HARTFORD, CONN., v. DOWNEY.

(Circuit Court of Appeals, Fourth Circuit. May 4, 1915.)

No. 1268.

INSURANCE ☞330—FIRE INSURANCE—"INCUMBRANCE" BY CHATTEL MORT-GAGE.

A corporation, indebted on two notes amounting to $22,000, one of which was secured by bonds secured by a deed of trust on its real estate, executed a $22,000 note and issued new bonds, secured by a new deed of trust on all its property. The deed was approved and recorded, and the bonds were certified by the trustee and handed over to the creditor. The original notes and security were retained pending payment by the corporation of accrued interest. *Held* that, though the new note was not accepted, and was not to be accepted until the accrued interest on the old notes had been paid and they were surrendered, the new deed of trust was an "incumbrance," within a fire policy on the property of the corporation, declaring that it should be void on the property becoming incumbered by a chattel mortgage.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 829–839; Dec. Dig. ☞330.

For other definitions, see Words and Phrases, First and Second Series, Incumbrance.]

In Error to the District Court of the United States for the Northern District of West Virginia, at Martinsburg; Alston G. Dayton, Judge.

Action by William W. Downey, receiver of the Stewart Vehicle Company, against the Hartford Fire Insurance Company of the City of Hartford, Conn. Judgment for plaintiff, and defendant brings error. Reversed.

John W. Davis, of Clarksburg, W. Va., and W. Calvin Chestnut, of Baltimore, Md. (Allen B. Noll, of Martinsburg, W. Va., on the brief), for plaintiff in error.

Malcolm Jackson, of Charleston, W. Va., and J. O. Henson, of Martinsburg, W. Va., for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

KNAPP, Circuit Judge. The defendant in error (plaintiff below) recovered a judgment, entered upon the verdict of a jury, in an action upon a fire insurance policy issued to the Stewart Vehicle Company, a West Virginia corporation, which carried on business at Martinsburg, in that state. The assignments of error are based upon exceptions to certain instructions given to the jury by the judge presiding at the trial, and to his refusal of certain instructions requested by the defendant, including the direction of a verdict in its favor. The

policy in question is of the New York standard form, prescribed also by the laws of West Virginia, and contains the following provision:

"This entire policy shall be void if * * * the subject of insurance be personal property and be or become incumbered by a chattel mortgage."

The property insured, which consisted of the merchandise in stock of the Vehicle Company, was totally destroyed by fire on the 15th of September, 1912, while the policy was in force; but the insurance company denies liability on the ground that the property had become incumbered with a chattel mortgage. The facts in this regard appear to be these:

At the time of the fire the Vehicle Company was indebted to the Maryland Surety & Trust Company, of Hagerstown, to the amount of approximately $30,000, evidenced by three notes described as follows:

(a) Demand note for $10,000, dated December 30, 1911, for which the Trust Company held as collateral the same amount of first mortgage bonds of the Vehicle Company secured by deed of trust covering its real estate only. This note contained the following provision:

"We agree that the above-named securities, and any others added to or substituted for them, all cash at any time to the credit of our account, and all notes and drafts deposited by us for collection in said bank, may be held as collateral security for all the obligations and liabilities of the undersigned, both individual and partnership, and the indorsers hereof, due to the said Maryland Surety & Trust Company, or to become due, or that may hereafter be contracted."

(b) Demand note for $12,000, dated December 30, 1911, for which the Trust Company held no specific security.

(c) Thirty-day note, dated January 13, 1912, for $7,220, secured by invoices or open accounts due the Vehicle Company from its customers, to the amount of about $10,000, which had been assigned to the Trust Company, presumably when the note was discounted, with the agreement that the Vehicle Company should collect the money on these invoices and pay it over to the Trust Company in discharge of the obligation; and this arrangement appears to have been carried out to the extent of payments amounting to about $2,300.

In the transactions involved in this suit the Trust Company was represented by Mr. John M. Lane, its secretary and assistant treasurer, and it is evident that early in the year 1912 Mr. Lane became anxious about the indebtedness of the Vehicle Company and desired to reduce the amount or get additional security for its payment. There is no room for doubt that the Vehicle Company at this time was more or less embarrassed. It may not have been actually insolvent, or its business unpromising; but it was seriously hampered, to say the least, by lack of working capital. Mr. Lane was uneasy, if not apprehensive, about the situation, and sought actively to diminish the risk which this loan involved. He had frequent conferences with the general manager of the Vehicle Company, in which the situation was discussed with the view of reducing the line of discount or otherwise protecting his company.

To meet its financial difficulties and comply with the demand of the Trust Company for additional security, the Vehicle Company,

with the full knowledge and approval of Lane, decided upon a bond issue of $50,000, secured by deed of trust on all its real and personal property, which should be used in the first instance to provide the Trust Company with further collateral and then sold to the public from time to time, the proceeds to be applied to the payment of the Trust Company's debt until it was extinguished, and the balance utilized for additional capital. It was further understood that the Vehicle Company should enter into a contract with the Takoma Investment Company of Chicago, as the fiscal or selling agent of the bonds, which were to be placed in the hands of the Trust Company, and that as sales were made to investors the bonds would be forwarded by the Trust Company with sight draft attached, the proceeds to be received by the Trust Company and credited upon its loan until it was fully liquidated.

As the new bonds were to be a first lien on all the property of the Vehicle Company, and so sold to the public, it was, of course, necessary for the Vehicle Company to procure a surrender of the prior issue of bonds, then held by the Trust Company, as above stated, and a release of the trust deed on the real estate by which those bonds were secured. Steps were accordingly taken to carry out this plan, but there was considerable delay in bringing it to consummation; and it was not until the 16th of August that the trust deed was executed and acknowledged. On the 19th of August the officers of the Vehicle Company, namely, Claude Stewart, its vice president and general manager, C. H. Harris, its secretary and treasurer, and William W. Downey, its counsel and the trustee named in the deed of trust, took the papers to Hagerstown. The bonds were delivered to the Trust Company, or at least placed in its possession, and the trust deed left with Mr. Lane for approval by the counsel of his company. It was arranged at the same time that the two notes for $10,000 and $12,000, respectively, which the Trust Company then held, should be replaced by a new note for $22,000. A memorandum was made of the accrued interest on the old notes, amounting to $183.34, which was to be paid by the Vehicle Company, and a demand note for $22,000 drawn up and given to Mr. Harris for execution by that company.

The deed of trust was duly approved by the counsel of the Trust Company, but it was found upon examination that the bonds had not been signed by the officers of the Vehicle Company, although they were properly certified by Downey, the trustee. Thereupon, on the 20th of August, Lane returned the deed of trust to the Vehicle Company, with a letter stating that it would be necessary for the president and secretary of that company to come over and execute the bonds under its corporate seal. Accordingly these officers went to Hagerstown a few days later, where they signed the bonds and affixed the corporate seal. For some reason there was delay on the part of the officers of the Vehicle Company in executing and returning the new note, paying the accrued interest on the old notes, and getting the deed of trust recorded, and they were repeatedly urged by Lane to complete these details of the arrangement. He testifies that he telephoned them a number of times to the effect that he could not

understand the delay in recording the deed of trust, or see any reason why the transaction was not concluded. On the 7th of September he wrote the Vehicle Company as follows:

"We have not as yet received new note for $22,000, which was given you some time ago to take up your old notes for $10,000 and $12,000 respectively, nor have we been advised by you that the new deed of trust, that secured an issue of $50,000 in bonds, has been recorded. If this has not been done, kindly advise us early Monday morning over the telephone the cause for the delay."

On September 9th the Vehicle Company made the following answer:·

"We received your letter of the 7th instant, and note what you say relative to note and recording of deed of trust. We are inclosing herewith note, and will say that deed of trust has been given to Mr. Downey. We tried to get him this morning to see if he had put same on record; we presume he has. He will be home to night, when we will take the matter up with him, and see that it is attended to promptly."

To this Lane replied the next day as follows:

"We have your letter of the 9th, inclosing new note for $22,000. You neglected to inclose check for accrued interest on the old notes, amounting to $183.34, which kindly forward, and upon receipt of advice that the new deed of trust has been filed for record we will return the old bonds for cancellation, so that the old deed of trust can be released. Kindly give the matter of having the new deed of trust recorded your immediate attention."

This letter appears to have had the desired effect, for the new deed of trust was recorded on the 12th of September, and the record office receipt therefor mailed to and received by Lane prior to the fire, which occurred, as above stated, on the 15th of September, 1912. . In this connection it may be mentioned that the total loss was adjusted at $105,849.42, with aggregate insurance of $107,500. Of this amount of insurance $80,500 was on the stock, which was less than its adjusted value. The policy in suit was for $10,000, and covered the stock only, and it is conceded that the defendant, if liable at all, is liable for the full amount of its policy and interest.

When the fire. occurred it became apparent to the officers of the Vehicle Company that a receivership was desirable and immediate steps were accordingly taken. On the night of the 16th of September a bill in equity was prepared for the appointment of a receiver; the plaintiffs named in this bill including Downey, Claude Stewart, R. N. Stewart, his father, who was president of the company, and. Harris, its secretary and treasurer. In paragraph 10 of this bill is recited the original bond issue of $10,000, and in paragraph 11 the new bond issue of $50,000, secured by the deed of trust in question. In paragraph 12 is the following allegation:

"Plaintiffs aver that the bonds mentioned in paragraphs 10 and 11 hereof were regularly issued, but plaintiffs are informed and believe that none of said bonds have been sold, but they are informed and believe, and therefore charge, that all of said bonds have been deposited with the said defendant, the Maryland Surety & Trust Company, a corporation, as collateral security for a loan made by it to the said Stewart Vehicle Company, which your plaintiffs are informed amounts to about the sum of $22,000. Your plaintiffs further aver that a sale of the said bonds so placed as collateral would necessarily be at a sacrifice, and a sale ·of the same by the said bailee would be

of irreparable injury to the said The Stewart Vehicle Company and to your plaintiffs as stockholders therein."

The bill was sworn to by Harris on the morning of the 17th, filed that day, and Downey thereupon appointed sole receiver. The order of appointment also enjoined the Trust Company "from selling or otherwise disposing of certain bonds of the said company amounting to the sum of $60,000, secured by two deeds of trust upon the assets of said company placed with said bank as collateral for a loan by it."

The insurance companies were promptly notified of the fire and sent their representatives to investigate and adjust the loss. The receiver also employed adjusters to represent him in the matter of the insurance, and they prepared formal proofs of loss, which were signed and sworn to by him as receiver, and also by Claude Stewart as vice president of the Vehicle Company. Each of these proofs of loss, about 40 in number, one for each policy, contained substantially the following statement:

"Except as noted below, the property described belonged, at the time of said fire, to assured in fee simple (not held under lease), and no other person or persons had any interest therein; no assignment, or transfer, or incumbrance of said property has been made, and no change in the title, use, occupation, location, or possession of said property has occurred since the issuance of said policy, except bonded indebtedness of $60,000, bonds owned by assured, but hypothecated with Maryland Surety & Trust Company to secure a commercial paper loan of $22,000."

Although the adjusters for the insurance companies at once took the position that the policies were invalidated by the deed of trust, and refused to proceed until a proper waiver was executed, the Trust Company retained the bonds and the $22,000 note for some months afterwards, claiming the right to hold them as security for the debt of the Vehicle Company. Meanwhile, in November, 1912, counsel for the insurance companies wrote to Mr. J. Clarence Lane, the attorney of the Trust Company, and the uncle of John M. Lane, for information concerning the claim of the Trust Company to these bonds, and he replied on the 13th of that month, after consultation with his nephew, in a letter of some length from which the following is quoted:

"I learned from the Maryland Surety & Trust Company that three or four years ago they loaned the Vehicle Company $10,000 and received as security therefor $10,000 of bonds secured by deed of trust as a first lien on the property. Subsequently they made additional loans, which were secured by various notes. Then the company came with a proposition for the surrender of the bonds and the substitution of the bonds under a new deed of trust for $50,000, stating that a finance company in Chicago could sell the bonds for them. The bank agreed to this arrangement, and stated that upon the execution of the deed of trust, and the delivery of the entire issue of $50,000 of bonds, they would surrender the old bonds and release the old deed of trust, and would hold the new bonds as collateral security for the obligations due the bank, and would deliver them as sold, and credit the proceeds upon the obligations until the indebtedness was liquidated. The $50,000 of bonds were delivered to the Maryland Surety & Trust Company, and were duly certified by Mr. Downey as trustee. The bank now holds both sets of bonds as security for the debts due."

Nothing further appears to have transpired until December 10, 1912, when the receiver wrote to the defendant company, calling attention

to the fact that more than 60 days had elapsed since the proofs of loss were furnished, making demand for payment, and stating further as follows:

"In this connection you are also notified that the attempted hypothecation of certain bonds owned by the insured by certain employés of the said Stewart Vehicle Company was not in fact an hypothecation thereof."

It will be noted that this letter contains no denial that the officers of the Vehicle Company intended to hypothecate the bonds and states no reason for claiming that their hypothecation had not been effected; nor is there any suggestion that the Trust Company had not accepted the bonds as additional security for its debt. Indeed, it appears that the receiver made no demand for a return of the bonds until the 18th of March, 1913. And the demand then made was not at once complied with, for the bank continued to retain the bonds, still claiming to hold them as security for the indebtedness of the Vehicle Company, until it became satisfied that they were valueless for that purpose. Lane himself testifies:

"We held them until we found out that we couldn't. Just as long as we could. * * * We held them until we found out they were no good to us, and we couldn't get any money out of them."

It is evident that Lane finally discovered, or was advised, that the retention of the bonds under claim of holding them as collateral security would have the effect of invalidating the insurance policies because of the chattel mortgage provision which they contained. It was only when convinced of this that he surrendered the bonds and the $22,000 note. Shortly afterwards the receiver brought suits against the insurance companies.

Upon consideration of the foregoing facts, which appear to be wholly undisputed, we are constrained to hold as a matter of law that at the time of the fire the insured property had "become incumbered by a chattel mortgage," which avoided the policy, and the reasons for that conclusion will be indicated in a brief review of the opposing contentions. It is conceded that the action must fail if the bonds were actually hypothecated, for then they would be outstanding, and the case therefore turns upon the question whether their hypothecation had been effected. The plaintiff argues that a valid pledge of the bonds cannot be claimed, because the arrangement with the Vehicle Company was not fully consummated. But the deed of trust had been executed by the proper officers of the company, acting upon authority of its stockholders and directors, submitted to and approved by the Trust Company's counsel, and duly recorded in the clerk's office. The bonds likewise were signed by the president and secretary, certified by the trustee, and handed over to the Trust Company. We are unable to see that anything whatever remained to be done by the Vehicle Company to make the deed of trust a lien upon its property, so far as the instrument itself was concerned, or to complete the possession and control of the new bonds by the Trust Company. It seems clear to us that this accomplished an unconditional delivery of the securities to the bank for the purposes contemplated by the arrangement, and that nothing else can be made of it. The right of the Trust

Company to hold the bonds as security for the debt of the Vehicle Company was conferred without reserve by the unequivocal acts of the parties, and there is no reasonable doubt that both of them so regarded the transaction.

But the plaintiff insists that this view is erroneous, because the bonds were pledged, or were to be pledged, only as security for the $22,000 note, and that there was no completed or valid pledge, because this note had not been formally accepted by the Trust Company. It appears that it was the practice of the bank to place serial numbers upon discounted notes when they were entered in its books, and that the note in question had not been numbered or entered. Apparently this was because the bank was retaining the old notes to await payment of the accrued interest before charging them out and entering the new note which represented the same indebtedness. However this may be, the question whether the new note had been accepted by the bank was presumably regarded by the trial judge as a question of fact, and one of almost controlling importance, because he gave the jury the following instruction:

"The court instructs the jury that unless said bonds were at the time of said fire held by the Maryland Surety & Trust Company as collateral security for the payment of the $22,000 note dated August 19, 1912, said bonds were not issued and outstanding at the time of said fire, and that said bonds could not be held as such collateral security unless the Maryland Surety & Trust Company was at the time of said fire the owner of said $22,000 note."

But, admitting that the new note had not been accepted, and was not to be accepted until interest was paid on the old notes and they were surrendered or canceled, it does not follow that there was not a complete and valid hypothecation of the new bonds as security for the existing indebtedness. It was the long standing debt of the Vehicle Company and its precarious financial condition which caused the apprehension of Lane and led to his persistent efforts to get more adequate security. Leaving out of view the note of $7,220, which was apparently expected to be paid from the proceeds of the assigned accounts, more than half of the amount loaned to the Vehicle Company was wholly unsecured, and it was obviously Lane's desire, as well as the evident purpose of the arrangement which he approved and encouraged, to get a first lien upon all the property of the debtor for the protection of his bank. The debt was created when the money was loaned, and the notes then given were merely the evidence of that debt. The substitution of a new note would not affect the debt, but merely change the character of the written evidence. And it was the debt that was to be secured, whether represented by the old notes or by a new one of the same aggregate amount. This was the plain intention of the parties at the time, and this they asserted, after the fire occurred, was what they had accomplished. The owners of the Vehicle Company so declared when they alleged in the bill for the appointment of a receiver that the bonds described had been deposited with the Trust Company "as collateral security for a loan made by it," and the attorney for the Trust Company was equally explicit when he wrote, two months after the fire, that "the bank holds both sets of bonds as security for the debts due." It would be difficult to express

more plainly the common understanding of both parties as to what they had done, and it seems almost trivial to contend that the pledge of new bonds was incomplete, or revocable by the Vehicle Company, because the $22,000 note, which the bank called for and got, had not been entered upon its books. The transaction must be judged by its substance and manifest purpose, and not by its form in some minor and unessential detail. The giving of a new note, which had no consideration except the existing debt, was a mere matter of banking convenience. The object of the Trust Company was fully attained when it got possession of the bonds and was advised that the instrument which secured them, previously examined and approved, had been duly recorded. If the bank then acquired the right to hold the bonds as security for its debt, which appears to us not open to question, that right would not have been in the least impaired if the Vehicle Company had never signed or sent the consolidated note.

It is also argued with much earnestness that there was no valid pledge of the new bonds because the old bonds were not surrendered before the fire occurred, and because the Vehicle Company had neglected to pay a small amount of accrued interest on the original notes. In other words, the theory is advanced that the acceptance of the new bonds was conditioned upon the return of the old issue. But this seems to us an untenable position. We are clearly of opinion that these circumstances, which are now relied upon to repudiate the transaction, were wholly without effect upon the right of the bank to take and hold the new bonds as security for its debt. It is of course true that the old bonds were to be returned, and undoubtedly they would have been surrendered if the fire had not occurred; but the neglect or failure of the bank to return them immediately upon being advised of the recording of the trust deed, which was only two or three days before the fire, did not serve to invalidate the pledge of the new bonds or render them any less completely delivered to and accepted by the bank as security for its debt. Stated in another way, the conditions here referred to obviously related to the return of the old bonds and not at all to the retention of the new issue. Whatever remained to be done to get the old bonds back, and nothing appears except the nonpayment of a hundred and eighty odd dollars of accrued interest, did not affect the title of the bank to the new bonds or its right to hold them as against the Vehicle Company. To say otherwise is to say that the Vehicle Company had the power to postpone indefinitely a binding pledge of the new bonds by simply neglecting to comply with the conditions, if any there were, upon which the old bonds would be surrendered. In short, there is no sustainable basis for the contention that the bank had not acquired the right to hold the new securities merely because when the fire occurred the old bonds happened to remain in its possession. The Vehicle Company was entitled to their return, certainly upon payment of the small item of accrued interest, and the circumstance that it had not taken them up, in the brief period before the property was destroyed, cannot be held to support the belated claim of the Trust Company that the new bonds had not been hypothecated. Moreover, the contention here reviewed is inconsistent

with the demand of the Trust Company for further security, inconsistent with the intention of the parties at the time, as manifested by their acts, and inconsistent with their subsequent declarations.

The force of these considerations is not weakened in our judgment by the evidence of plaintiff's witnesses. Downey says that he did not know, when the bill for a receiver was drawn and when he swore to the proofs of loss, that the Trust Company had not accepted the new note. Stewart avers that he did not read the proofs of loss which he verified; and Harris, who swore to the bill for a receiver, pleads inadvertence of mind because he was "wrought up over the situation to a considerable extent." But these witnesses made no attempt to show any lack of authority or intention on their part to secure the bank by a pledge of the new bonds, nor did they give any explanation of their previous statements under oath, except to say or imply that when those statements were made the nonacceptance of the $22,000 note was unknown to them.

This is the position taken by Lane, with the added contention, by inference and argument rather than the statement of any fact, that the arrangement for securing the bank was not completed, when the fire occurred, because the old bonds had not been surrendered. This contention is covered by what has already been said, and the discussion need not be repeated. True, he says that he knew at the time that it would be necessary to have the consent of the insurance companies in order to keep the insurance in force, but it does not appear from his testimony that this subject was mentioned in any interview with the officers of the Vehicle Company, nor did he refer to it any way in the letters urging them to send the new note and get the trust deed recorded. And it is certainly difficult to reconcile what he says upon this point, when examined as a witness at the trial, with the retention of the bonds for more than six months after the fire, all the while claiming to hold them as security for the Vehicle Company's debt. Indeed, it is impossible for us to read his lengthy testimony without being convinced that he simply overlooked the fact that the insurance would be invalidated unless the companies consented to the execution of the deed of trust. Nor can we avoid the belief that, if the fire had not occurred, or if the policies had not contained the chattel mortgage provision, the bank would have resisted to the utmost any claim that these bonds were not held as a valid and unconditional pledge; and the contrary attitude now assumed seems clearly born of the after-acquired knowledge that the insurance companies would be relieved of liability, and the bonds thereby rendered practically worthless, if the bank continued to claim the right to hold them as collateral security.

For these reasons we are of opinion, upon this record, that a verdict should have been directed for the defendant, and it follows that the judgment must be reversed.